# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HARRY BEER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 08-cv-1807 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.     INTRODUCTION

This action arises from the June 11, 2003 suicide bombing of a bus in Jerusalem by members of the terrorist organization Hamas.[1]  The attack killed 17 people, including Alan Beer, a United States citizen living in Israel at the time.  Plaintiffs, who are Mr. Beer's mother and siblings, previously brought suit against defendants Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") pursuant to the former "state-sponsored terrorism" exception to the Foreign Sovereign Immunities Act ("FSIA"), which at the time was codified at 28 U.S.C. § 1605(a)(7).  In that action, this Court found that defendants—who provided regular support to Hamas and encouraged the tactic of suicide bombing—were legally responsible for the attack that killed Mr. Beer, and awarded plaintiffs $13 million in compensatory damages.  *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1, 12–14 (D.D.C. 2008) ("*Beer I*").  The Court denied plaintiffs' request for punitive damages, however, holding that such an award was unavailable under either § 1605(a)(7) or Pub. L. 104-208, § 589, 110

---

[1] Throughout this opinion, references to "Hamas" refer to "Harakat al-Muqawama al-Islamiyya, the jihadist Palestinian militia" that is generally known by that name.  *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 79 (D.D.C. 2006).

(1996), 110 Stat. 3009-1, 3007-172 (codified at 28 U.S.C. § 1605 note) (the "Flatow Amendment"). *Beer I*, 574 F. Supp. 2d at 14.

Prior to final judgment in *Beer I*, Congress passed the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), which replaced § 1605(a)(7) with a new state-sponsored terrorism exception. Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008). This exception, codified at 28 U.S.C. § 1605A, "creat[es] a federal right of action against foreign states, for which punitive damages may be awarded." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 40 (D.D.C. 2009) (citing *Simon v. Republic of Iraq*, 529 F.3d 1187, 1190 (D.C. Cir. 2008) ("*In re Terrorism Litig.*"). The NDAA also permits plaintiffs to seek retroactive application of § 1605A in certain limited circumstances. *Id*. at 62–63. Plaintiffs here—the same plaintiffs as in *Beer I*—seek to invoke the additional remedies provided by the new state-sponsored terrorism exception through the retroactive procedures outlined in the Act. For the reasons set forth below, the Court finds that plaintiffs have sufficiently established their right to relief under § 1605A.

## II. PROCEDURAL HISTORY

### A. *Beer I*

Plaintiffs filed their original action against defendants pursuant to § 1605(a)(7) in early 2006. *Beer I*, 574 F. Supp. 2d at 5. At that time, § 1605(a)(7) did not provide an independent cause of action, but rather acted "as a 'pass-through' to substantive causes of action . . . that may exist in federal, state or international law." *Id*. at 10 (citing *Dammarell v. Islamic Republic of Iran*, No. 01 Civ. 2224, 2005 U.S. Dist. LEXIS 5343, at *8–10 (D.D.C. Mar. 29, 2005)). Plaintiffs' Complaint in *Beer I* thus set forth state law claims for wrongful death, conscious pain and suffering, and intentional infliction of emotional distress. *Id*. at 11–12.

The *Beer I* Court held an evidentiary hearing concerning plaintiffs' claims on January 31, 2008. *Id*. at 5–6. At that hearing, the Court heard testimony from plaintiffs and other witnesses, received various supporting documents, and admitted into evidence the taped deposition of Dr. Patrick Clawson, *id*. at 6–8, an expert on Iranian affairs and international terrorism whom this Court has frequently heard testify concerning Iranian involvement in state-sponsored terrorism. *See, e.g.*, *Rimkus v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 08 Civ. 1615, 2010 U.S. Dist. LEXIS 120991, at *5 (D.D.C. Nov. 16, 2010) (describing Dr. Clawson as "an expert on Iranian support for terrorism"); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 62 (D.D.C. 2010) (noting that Dr. Clawson is "a widely-renowned expert on Iranian affairs"). Following this hearing, the Court made numerous findings of fact concerning the decedent, the parties, and the events surrounding the 2003 suicide bombing. *See generally Beer I*, 574 F. Supp. 2d at 6–8.

Based on its findings of fact, the Court in *Beer I* found that "Iran has continuously provided material support in the form of, *inter alia*, funding, training, and safe haven to Hamas . . . so that it may undertake terrorist attacks like the one in this action." *Id*. at 11. On the basis of all the evidence, the Court also found that a civil conspiracy existed "between Hamas and defendants Iran and MOIS." *Id*. Applying Ohio and Virginia law—where the decedent and plaintiffs were domiciled—the Court then held that Iran and MOIS were liable for the intentional torts of wrongful death, infliction of conscious pain and suffering, and intentional infliction of emotional distress. *Id*. at 11–12. In determining damages, the Court awarded Mr. Beer's estate $500,000, his mother, Anna Beer, $5 million, and each of his siblings—Harry Beer, Estelle Carroll, and Phyllis Maisel—$2.5 million. *Id*. at 13–14. The Court denied plaintiffs' request for

punitive damages, however, noting that "punitive damages were not available against foreign states" under then-applicable law. *Id.* at 14.[2]

## B.     This Action

Plaintiffs filed this action less than two months after the entry of final judgment in *Beer I*. Complaint, Oct. 17, 2008 [3]. In their Complaint, plaintiffs set forth federal claims under § 1605A and federal common law, as well as the same claims for wrongful death, infliction of conscious pain and suffering, and intentional infliction of emotional distress under state law that they alleged in *Beer I*. *See id.* at ¶¶ 18–33. In support of these claims, plaintiffs allege that defendants "routinely, knowingly and by explicit or implied agreement with Hamas provided material support and substantial assistance to it and its cadre of suicide bombers," *id.* at ¶ 14, and that plaintiffs' "injuries . . . stemmed proximately from willful and deliberate acts carried out with material support and substantial assistance from" Iran and MOIS. *Id.* at ¶ 16. Plaintiffs seek compensatory and punitive damages. *Id.* at 8.

Plaintiffs served copies of the relevant papers and necessary translations by diplomatic channels through the U.S. Department of State, as required by 28 U.S.C. § 1608(a)(4). Based on the diplomatic note submitted pursuant to that subsection, the effective date of service in this case was June 9, 2010. Return of Service/Affidavit 6, Aug. 20, 2010 [19]. The state-sponsored terrorism exception requires that defendants "serve an answer or other responsive pleading . . . within sixty days after service has been made under this section." 28 U.S.C. § 1608(d). Here, neither defendant has ever appeared in this action or otherwise responded, and so the Clerk of the

---

[2] As noted above, final judgment in *Beer I* was rendered after the passage of the NDAA, and thus plaintiffs were eligible at that time to obtain retroactive application of § 1605A. However, the *Beer I* plaintiffs never moved for such retroactive application, as contemplated by the procedures provided by the Act. NDAA § 1083(c)(2) (stating that a prior "action, or any judgment in [such an] action shall, on motion made by plaintiffs . . . be given effect as if the action had originally been filed under section 1605A"). The Court in *Beer I* thus retained jurisdiction and proceeded under the former § 1605(a)(7). *See Simon*, 529 F.3d at 1191 ("[C]ourts retained jurisdiction over cases pending pursuant to former § 1605(a)(7) when the Congress enacted the NDAA.").

Court entered default on their behalf in early November. Clerk's Entry of Default, Nov. 2, 2010 [23]. Plaintiffs subsequently moved this Court for entry of default judgment and requested that the Court to take judicial notice of the proceedings in *Beer I*. Motion for Default Judgment, Nov. 13, 2010 [25]. Based on that motion, the record in these proceedings, and facts available for judicial notice, the Court makes the following findings of fact and conclusions of law.

## III.   FINDINGS OF FACT

Though the defendants have not appeared in this action, the FSIA does not permit a court to enter default judgment unless it determines that plaintiffs have "establishe[d their] claim or right to relief by evidence that is satisfactory to the court." 28 U.S.C. § 1608(e). This statutory requisite imposes a duty upon a court in FSIA actions to not simply accept a complaint's unsupported allegations, but obligates it to "'inquire further before entering judgment' against parties in default." *Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991, at *13–14. To assist the Court in satisfying its obligation here, plaintiffs ask the Court to take judicial notice of the evidence presented to, and findings made by, the Court in *Beer I*. *See Valore*, 700 F. Supp. 2d at 59 (holding that FSIA courts may "take judicial notice of related proceedings and records in cases before the same court").

### A.       Judicial Notice of Prior Related FSIA Proceedings

Judicial notice of prior findings of fact in related proceedings is a difficult issue. On the one hand, by drawing upon its prior opinion, the Court can be sure that the facts it is finding are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned," Fed. R. Evid. 201(b)(2), as the accuracy of a published judicial opinion is generally indisputable. At the same time, "judicial findings are probabilistic determinations based upon a limited set of data points—the evidence before the Court—they are not

indisputable facts," *Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991, at *17—as required for purposes of judicial notice. *See* Fed. R. Evid. 201(b) (permitting judicial notice only of facts "not subject to reasonable dispute").

In grappling with these difficulties, the Court recently observed that "the statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack." *Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *18 (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)). Based on this understanding, the Court determined that the proper method for noticing related proceedings in FSIA cases is one "that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced." *Id.* (citing *Murphy v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 06 Civ. 596, 2010 U.S. Dist. LEXIS 101250, at *11 (D.D.C. Sep. 24, 2010)). Consistent with these principles, the Court here will take notice of the evidence presented in *Beer I*, and will use that evidence to reach its own independent findings of fact.

### B.    Relevant Findings of Fact

Plaintiffs' suit arises out of a 2003 suicide bombing of a bus in Jerusalem—the same subject matter at the center of *Beer I*. On January 31, 2008, the Court held an evidentiary hearing in that case, at which time it heard testimony from plaintiffs and other witnesses, and received extensive documentary evidence. *Beer I*, 574 F. Supp. 2d at 5–6. Based on judicial notice of that evidence, the Court makes the following findings of fact:

*Decedent*

Documentary evidence establishes that Alan Beer was an American citizen born and domiciled in the state of Ohio. *Id.* at 6. Throughout his life, Mr. Beer frequently traveled

between the U.S. and Israel, at one point residing in Israel for four consecutive years. *Id*. He last

left the United States for Israel in early 2003, nearly six months prior to the attack. *Id*. Mr.

Beer's estate is represented in this action by its administrator—his brother Harry Beer. *Id*.

*Parties*

The plaintiffs in this action are all United States citizens and close relatives of Mr. Beer.

*Id*. Specifically, plaintiff Anna Beer is the mother of the decedent, while the remaining

plaintiffs—Harry Beer, Phyllis Maisel and Estelle Carroll—are all his siblings. *Id*.

Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism

pursuant to section 69(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j),

continuously since January 19, 1984, *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 47

(D.D.C. 2006)—well before the attack in 2003. Defendant MOIS is Iran's secret police and

intelligence organization. This Court has previously characterized it as a "division of the state of

Iran," *Valore*, 700 F. Supp. 2d at 65, and at least one other district court has found that "Iran

funnels much of its support to Hamas through MOIS." *Campuzano v. Islamic Republic of Iran*,

281 F. Supp. 2d 258, 262 (D.D.C. 2003).

*The June 11, 2003 Suicide Bombing*

In *Beer I*, the Court received into evidence the taped deposition of Dr. Patrick Clawson, a

renowned expert on Iranian operations and their involvement with international terrorism. *See*

*supra* Section II.A. Dr. Clawson previously studied the attack, and testified to the following

facts: "On June 11, 2003, a Hamas suicide bomber blew up Egged bus number 14A." *Beer I*,

574 F. Supp. 2d at 6. According to reports from the U.S. Department of State, the explosion

killed 17 people, including two U.S. citizens (one being Mr. Beer), and wounded 99 others. U.S.

Dep't of State, *Patterns of Global Terrorism 2003* app. A, at 12 (2004). Dr. Clawson further

testified that, shortly after the attack, Hamas claimed responsibility for the suicide bombing, stating that the operation was undertaken in retaliation for Israeli attempts to assassinate a senior Hamas leader. *Beer I*, 574 F. Supp. 2d at 6.

In addition to secondary reviews of the 2003 bombing, the Court also heard testimony from Pesach Dov Maisel—a nephew of Mr. Beer who was living in Israel and working for Israeli Emergency Medical Services at the time. *Id*. at 7. Mr. Maisel relayed a story told to him by one of the doctors that responded to the scene of the attack. The doctor described a victim who "was conscious after the bombing but had extensive shrapnel wounds. . . . By the time the medics brought him to the ambulances to be transported to the to the hospital, he was dead." *Id*. Mr. Maisel later learned that the man described by the doctor was his uncle, Alan Beer. *Id*.

*Iranian Support for Hamas and Involvement in the 2003 Bombing*

The evidence presented to the Court in *Beer I* establishes that "Hamas is an organization supported by Iran." 574 F. Supp. 2d at 6. Indeed, numerous courts in this district have previously found that a strong connection exists between defendants and Hamas. *See, e.g.*, *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 14 n.4 (D.D.C. 2009) ("Hamas . . . is an organization that has been supported over the years by the Islamic Republic of Iran, primarily through . . . MOIS."); *Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152, 154 (D.D.C. 2009) (finding sufficient evidence to determine that "Iran and its MOIS provided material support to Hamas in furtherance of its terrorist objectives"); *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 206 (D.D.C. 2008) ("Hamas is an organization supported by Iran."). And according to the U.S. Department of State, "Hamas receives some funding, weapons, and training from Iran," U.S. Dep't of State, *Country Reports on Terrorism 2009*, Chp. 6 (2010)—a finding that is consistent with the State Department's opinion at the time of the attack. *See*

*Patterns of Global Terrorism 2003*, *supra* at app. B, at 120 (noting that Hamas "[r]eceives some funding from Iran").

In addition, Dr. Clawson also testified about defendants' support for, and involvement with, Hamas. *Beer I*, 574 F. Supp. 2d at 7. He explained that, during the relevant period, "Iran maintained a high-profile role in encouraging anti-Israeli activity while providing Hamas and other terrorist organizations with funding, safe haven, training, and weapons." *Id.* at 7; *see also Belkin*, 667 F. Supp. 2d at 14 n.4 ("Iran fully knew of the purposes and objectives of Hamas and approved of them."). He also related a particular incident where "Iran hosted a conference in August 2003 on the Palestinian *intifadah* at which an Iranian official suggested that the continued success of the Palestinian resistance depended on suicide operations." *Beer I*, 574 F. Supp. 2d at 7. Based on this evidence, the Court determines that Iran and MOIS routinely provided support in various forms for Hamas and encouraged the practice of suicide bombing, and that these activities directly led to the June 11, 2003 attack that killed Alan Beer.

## IV.     CONCLUSIONS OF LAW

Based on the above findings of fact, the Court reaches the following conclusions of law:

### A.     Jurisdiction

Under the FSIA, "foreign states generally enjoy immunity from suit in U.S. courts." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 329 (D.C. Cir. 2003). This broad protection is provided both by withdrawing original jurisdiction over suits against foreign states from all state and federal courts, and by limiting the circumstances in which a court may hear a claim against a foreign state. 28 U.S.C. §§ 1604 & 1605A(2). These general immunities, however, are not unlimited, but rather are subject to certain enumerated exceptions—including the state-sponsored terrorism exception. Specifically, § 1605A provides that a court may exercise original

jurisdiction and hear a claim against a foreign state only under limited circumstances. The evidence establishes that these necessary circumstances are present in this case.

### 1. Original Jurisdiction

Under the FSIA's state-sponsored terrorism exception, U.S. courts have jurisdiction over suits brought against foreign states only where (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." 28 U.S.C. § 1605A(a)(1).

Here, each of these requirements is satisfied. First, plaintiffs seek only money damages. Complaint at 8. Second, defendant Iran is undeniably a foreign state. And with respect to defendant MOIS, this issue is whether it constitutes "a political subdivision . . . or an agency or instrumentality of a foreign state"; in which case it is treated as a foreign state under the FSIA. 28 U.S.C. § 1603(a). Under well-established precedent, this question turns on whether MOIS "is an integral part of [Iran]'s political structure." *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (internal quotations omitted). The evidence in this case shows that MOIS is a division of the state of Iran, and acts as an instrumentality in funneling money and resources to Hamas. *See supra* Section III.B. MOIS thus constitutes a foreign state for these proceedings. *See Beer I*, 574 F. Supp. 2d at 9 ("Defendant MOIS is treated as the state of Iran itself."). Third, the testimony and evidence establishes that Alan Beer died as a direct result of the suicide bombing of Egged bus 14A, and that plaintiffs—his mother and siblings— suffered greatly as a result. *See supra* Section III.B; *see also Beer I*, 574 F. Supp. 2d at 7–8 (cataloguing injuries suffered by plaintiffs as result of 2003 attack). Fourth, the evidence presented to the Court in *Beer I* demonstrates that Iran, through MOIS, provided regular support

to Hamas, and encouraged the use of suicide bombers by the group.  *See supra* Section III.B.

This evidence is sufficient to meet the FSIA's requirement that there be "some reasonable

connection between the act . . . and the damages which the plaintiff has suffered."  *Valore*, 700 F.

Supp. 2d at 66 (internal quotations omitted).  Finally, the testimony of Dr. Clawson, buttressed

by the findings of the U.S. Department of State, establishes that defendants routinely provided

financial and other assistance to Hamas—constituting material support under the FSIA.  The

Court may therefore exercise jurisdiction over this action.

### 2.     Waiver of Sovereign Immunity

Though the Court may exercise jurisdiction over this suit, it may not hear the claim

against defendants unless they have been found to have waived sovereign immunity.  The FSIA

provides that such immunity may be waived by operation of statute.  This occurs where (1) "the

foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . or was so

designated as a result of such act, and . . . either remains so designated when the claim is filed

under this section or was so designated within the 6-month period before the claims is filed under

this section," (2) the claimant or the victim was, at the time of the act . . . a national of the United

States [or] a member of the armed forces [or] otherwise an employee of the Government of the

United States . . . acting within the scope of the employee's employment," and (3) "in a case in

which the act occurred in the foreign state against which the claim has been brought, the

claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim."  28

U.S.C. § 1605A(a)(2)(i)–(iii).

The facts in this case establish a waiver of defendants' sovereign immunity.  First, Iran

has been designated a state-sponsor of terrorism since January 19, 1984, and was so designated

at the time of the suicide bombing in 2003.  *See supra* Section III.B.  Second, documentary

evidence shows that the victim—Alan Beer—was a U.S. citizen at the time of his death, and that each and every plaintiff is also a U.S. citizen. Finally, the suicide bombing occurred in Israel, not Iran, and thus the FSIA's provision of an opportunity for Iran to arbitrate the dispute is inapplicable. For these reasons, plaintiffs' claims may proceed, and the Court may render a decision as to defendants' liability for the 2003 bombing.[3]

## B.     Retroactive Application of § 1605A to this Case

In creating the new state-sponsored terrorism exception, Congress provided in the NDAA that the provision could be retroactively applied in certain situations. In particular, "a plaintiff in a case pending under former § 1605(a)(7) may move the Court to have that case treated as if brought under § 1605A, or a plaintiff may bring a separate action under § 1605A within a specified range following final judgment in the earlier related proceeding." *Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS at *46. Plaintiffs followed this latter approach, filing this action less than two months after final judgment in their original proceeding under § 1605(a)(7). *Compare Beer I*, 574 F. Supp. 2d at 14 (entering final judgment on August 26, 2008), *with* Complaint at 1 (initiating this action on October 17, 2008). This suit thus qualifies for retroactive application of § 1605A.[4]

## C.     Causes of Action

In the Complaint, plaintiffs allege several causes of action. First, the Complaint sets forth two Counts for "Personal Injuries Caused by Extrajudicial Killings" under federal law.

---

[3] Plaintiff served the Complaint on defendants through diplomatic channels on June 9, 2010, as authorized under the FSIA. 28 U.S.C. § 1608(a)(4). Return of Service/Affidavit, Aug. 20, 2010 [19]. The Court thus has personal jurisdiction over the defendants. *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 296 (D.D.C. 2003) (Lamberth, J.) (holding that personal jurisdiction exists over non-immune foreign state where service is effected under §1608).

[4] Though brought as a related action to *Beer I* under § 1605A, the Court pauses to note that, because the bombing occurred in 2003, plaintiffs could also have brought a completely new action under the new exception, without the need to resort to retroactive application of the Act. *See* 28 U.S.C. § 1605A(b)(2) (setting forth statute of limitations extending to "10 years after the date on which the cause of action arose").

Complaint Counts I–II.  Second, plaintiffs allege three causes of action under both Ohio and Virginia state law.  *See id*. at Counts III–V (stating claims for wrongful death, survivorship and intentional infliction of emotional distress).  The Court discusses each of these groups in turn.

### 1.     Federal Causes of Action

Plaintiffs set forth two nearly identical causes of action under federal law for extrajudicial killings.  To support these claims, plaintiffs allege that "Defendants [provided] material support in the attack and extrajudicial killings mentioned above, thereby causing personal injury to Plaintiffs."  Complaint at ¶¶ 19, 23.  In Count I, plaintiffs assert that "[a]ntiterrorism provisions codified at 28 U.S.C. § 1605A establish causes of action" for extrajudicial killing, *id*. at ¶ 19, while in Count II plaintiffs allege that "[f]ederal common law establishes causes of action" for extrajudicial killing.  *Id*. at ¶ 23.

As this Court has often discussed, § 1605A "actions arise solely from statutory rights," and thus "are not in theory matters of federal common law."  *Murphy*, ___ F. Supp. 2d at __, No. 06 Civ. 596, 2010 U.S. Dist. LEXIS 101250, at *53 (D.D.C. Sep. 24, 2010).  And the D.C. Circuit Court of Appeals has long cautioned that "it is a mistake . . . to label actions under the FSIA . . . as 'federal common law' cases, for these actions are based on *statutory* rights."  *Bettis*, 315 F.3d at 333.  Thus, though courts in FSIA cases "look to sources such as state decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be the well-established standards which serve as the bases for theories of recovery under § 1605A," *Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *52 (internal quotations omitted),  they must always be mindful that reliance on general principles of tort law "is not a license for judges to legislate from the bench."  *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 25 (D.D.C. 2009) (internal quotations omitted).

Bearing these principles in mind, plaintiffs' second claim for injuries resulting from extrajudicial killing, which is based on federal common law, cannot stand. As an initial matter, it is unclear whether principles of federal common law, which recognize traditional torts such as assault and battery, embrace the more narrow conception of extrajudicial killing as framed by plaintiffs in the Complaint. Moreover, for their part plaintiffs make no attempt to identify any such principles—either in the Complaint or in their motion for default judgment. And even assuming that federal common law did recognize such a cause of action, reliance on this source of law—where plaintiffs set forth an identical cause of action based on the statutory cause of action—is improper, duplicative and unnecessary. The Court will thus look to plaintiffs' claims as set forth in Count I, which are based on the cause of action provided by § 1605A.

As to plaintiffs' claims for injuries resulting from extrajudicial killing, as set forth in Count I, plaintiffs merely allege that "[a]s a proximate and foreseeable consequence of Defendants' material support and substantial assistance in the attack and extrajudicial killing described above, Plaintiffs . . . have suffered." Complaint at ¶ 21. This Court has previously observed, however, that to support a cause of action under § 1605A, plaintiffs must "prove a theory of liability under which defendants cause[d] the requisite injury or death." *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS at *45. In satisfying this obligation, "the elements of 'causation' and 'injury' require more than simply alleging that an act 'caused harm,' *Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS at *28—as plaintiffs have done here. Rather, plaintiffs in FSIA actions must "articulate the justification for [their] recovery, generally through the lens of civil tort liability." *Id*.

The need for such theories of recovery are driven by the fundamental requirement that the facts of a particular case must fit together in a manner that justifies the Court's finding of

liability and order transferring a right or benefit from one party to the other. For example, here the facts establish, at their most basic level, (1) that defendants supported Hamas and encouraged suicide bombings, (2) that Alan Beer was killed in a suicide bombing undertaken by a Hamas operative, and (3) that Mr. Beer's family members—plaintiffs here—suffered as a result of his death. *See supra* Section III.B. But these facts have gaps: though defendants may have supported Hamas, there is no evidence directly tying them to the June 2003 bombing; and though plaintiffs may have suffered due to the loss of Mr. Beer, there is no factual support for any assertion that defendants intended to cause such suffering. The purpose of requiring a theory of recovery, then, is to fill these gaps and provide the Court with a legal basis for determining responsibility. *See Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *28 (holding that plaintiffs must not only "establish causation as a factual matter, but . . . also demonstrate the culpability and liability of the defendant as a matter of law").

Performing this task, however, requires more than plaintiffs in FSIAs action alleging—in a conclusory manner—that defendants' actions caused their harm, as plaintiffs here have done. Instead, plaintiffs must articulate general principles of law in order to set forth a legal theory capable of filling these gaps, thus explaining *how* the actions of defendants led to their injuries, and *why* the defendants should be held liable for such harm. Here, plaintiffs have failed in this regard. Though plaintiffs' failure to do so here is not fatal, *see Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *29 ("The fact that plaintiff does not expressly set forth a prototypical common law cause of action will therefore not defeat his claim for relief."), the Court pauses to emphasize that plaintiffs in FSIA actions brought pursuant to § 1605A must generally allege and prove theories of recovery in order to establish a proper basis for relief.

### 2. State Law Causes of Action

In addition to their two federal claims, plaintiffs set forth three causes of action under state law. *See* Complaint at Counts III–V. These claims include wrongful death under Ohio law (Count III), a survival action under Ohio law (Count IV), and claims for intentional infliction of emotional distress under Ohio and Virginia law (Count V). Plaintiffs' approach adheres to FSIA parties' practices under former § 1605(a)(7), as that exception acted "as a 'pass-through' to causes of action found in state tort law." *In re Terrorism Litig.*, 659 F. Supp. 2d at 46.

The current state-sponsored terrorism exception, however, no longer acts merely as a "jurisdiction conferring provision," *Valore*, 700 F. Supp. 2d at 57 (internal quotations omitted), but instead provides "an independent federal cause of action." *Id*. at 58. As this Court has previously explained, "the enactment of § 1083 of the 2008 NDAA altered the entire legal context pertaining to litigation against state sponsors of terrorism because the underlying substantive legal basis for such actions has been shifted from state law to federal law." *In re Terrorism Litig.*, 659 F. Supp. 2d at 85. By creating a substantive legal claim under the FSIA, Congress sought to provide "a uniform federal standard designed to hold rogue nations accountable for their promotion of terrorists acts." *Id*. at 79; *see also Belkin*, 667 F. Supp. 2d at 21 ("'By providing for a private right of action and by precisely enumerating the types of damages recoverable, Congress has eliminated the inconsistencies that arise in these cases when they are decided under state law.'") (quoting *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 65–66 (D.D.C. 2008)).

Permitting FSIA plaintiffs to bring state law causes of action under § 1605A would nullify Congress' expressed purpose and largely undermine the sea-change effected by the enactment of the NDAA. Plaintiffs thus may not proceed with their state law claims in this action. However, plaintiffs' state law claims—while based on an improper source of law—do

articulate the theories of recovery lacking in their federal cause of action. The Court will therefore draw upon plaintiffs' allegations in support of these state law claims, and treat the Complaint as setting forth three distinct theories of recovery under the FSIA's federal cause of action—for wrongful death, survival and intentional infliction of emotional distress. *See Valore*, 700 F. Supp. 2d at 60–61 n.2 (construing § 1605A complaint alleging state law survival claim as bringing "this survival claim under the FSIA-created cause of action").

### D.      Liability

Under the state-sponsored terrorism exception to the FSIA, a plaintiff can bring suit against a foreign state for (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or an official, employee, or agent of the foreign state if the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. §§ 1605A(a)(1) & (c). As discussed above, *see supra* Section IV.C.1, the third and fourth elements of this claim—causation and injury—require a plaintiff to "prove a theory of liability under which defendants cause[d] the requisite injury or death." *Valore*, 700 F. Supp. 2d at 73. The Court takes each of these elements in turn.

### 1.      Act

Plaintiffs allege that defendants are liable under the FSIA's prohibitions against both extrajudicial killing and the provision of material support for terrorist activities. *See* Compl. ¶¶ 18–21 (generally alleging that injuries were caused by "Defendants' material support and substantial assistance" which resulted in "extrajudicial killings").

### a.      Extrajudicial Killing

The FSIA defines extrajudicial killing by reference to Section 3 of the Torture Victim Protection Act of 1991. 28 U.S.C. § 1605A(h)(7). That Act defines an extrajudicial killing as

> [(1)] a deliberated killing [(2)] not authorized by a previous judgment pronounced by a regularly constituted court [(3)] affording all judicial guarantees which are recognized as indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note. The evidence in this case establishes that the bombing of Egged bus 14A was planned by members of Hamas, *see supra* Section III.B, and there has been no evidence that the attack was sanctioned by any judicial body—legitimate or otherwise. The bombing itself thus constitutes an extrajudicial killing.

The evidence also demonstrates, however, that it was members of Hamas—not defendants—who undertook the bombing of the bus in Jerusalem. *See id.* Thus, for defendants to be liable for an extrajudicial killing, it must be shown that the suicide bomber was acting as their agent at the time of the attack.

Courts in FSIA cases look to general principles of law to define the scope of the federal cause of action provided in § 1605A. With respect to issues of agency, the Restatement provides: "Agency is the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control." Restatement (Second) of Agency § 1(1) (1958). Under this definition, a principal is a party "for whom action is to be taken." *Id.* at § 1(2). And this Court has similarly articulated the scope of agency in the FSIA context, holding that perpetrators of a terrorist act were agents for a foreign state when "acting at the behest and under the operational control" of that state. *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *49.

The evidence available to the Court in this case does not establish that the suicide bomber that destroyed Egged bus 14A was acting at the behest and under the operational control of

defendants. While there was, at the time of the attack, an established connection between Iran and Hamas, none of the evidence establishing such a link demonstrates that either defendant played a role in planning, preparing or supporting the specific attack at issue here. Instead, the evidence, even read in a light most favorable to plaintiffs, establishes merely that defendants provided financial support to Hamas and generally encouraged the practice of suicide bombing— it does not demonstrate that defendants controlled the actions of the Hamas operatives. *See* Restatement (Second) of Agency § 14 ("A principal has the right to control the conduct of the agent."). Nor does any allegation that Iran may have stood to benefit from the bus bombing that killed Mr. Beer create an agency relationship between defendants and the bomber. *See id*. at § 14 cmt. c ("There are many relations in which one acts for the benefit of another which are to be distinguished from agency by the fact that there is no control by the beneficiary."). Finally, the evidence here stands in stark contrast with that presented in suits against defendants Iran and MOIS for their direct involvement in certain other terrorist attacks, where the evidence demonstrated that defendants supported and assisted the perpetrators *for the specific purpose of carrying out the attack. See, e.g.*, *Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *22–24, *50 (relying on evidence that defendants recruited bombers, provided supplies and shelter, and specifically approved attack to determine that perpetrators "acted at the behest and direction of defendants . . . render[ing them] agents of defendants for FSIA liability purposes"); *Valore*, 700 F. Supp. 2d at 72 (finding that defendants "funded, technically assisted, and operationally controlled" perpetrators of 1983 Beirut Marine barracks bombing in determining that they were "subject to liability"). In sum, while Hamas is undoubtedly liable for the murder of seventeen individuals—including Alan Beer—defendants Iran and MOIS cannot be held vicariously liable for that extrajudicial killing.

### b.      Provision of Material Support

Plaintiffs also allege that defendants may be held liable under the FSIA for the provision

of material support to Hamas during the period surrounding the attack on Egged bus 14A.

Complaint at ¶¶ 20–21.  Section 1605A indicates that "material support or resources" is defined

by reference to the U.S. criminal code, 28 U.S.C. § 1605A(h)(3), which states that such support

> means any property, tangible or intangible, or service, including
> currency or monetary instruments or financial securities, financial
> services, lodging, training, expert advice or assistance, safehouses,
> false documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel . . . and
> transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).  The evidence presented in *Beer I* establishes that Hamas and the

Iranian state share a strong and long-standing relationship in which Iran—through MOIS—has

regularly provided funding and support for Hamas operations in a manner falling within the

scope of 'material support or resources.'  *See supra* Section III.B.

"'[T]he routine provision of financial assistance to a terrorist group in support of its

terrorist activities constitutes providing material support and resources for a terrorist act within

the meaning'" of the state-sponsored terrorism exception.  *In re Terrorism Litig.*, 659 F. Supp. 2d

at 42 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 19 (D.D.C. 1998)).  And

where the practice of regularly financing a terrorist organization is established by sufficient

evidence, "'a plaintiff need not establish that the material support or resources provided by a

foreign state for a terrorist act contributed directly to the act from which his claim arises.'"

*Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 (quoting *In re Terrorism Litig.*,

659 F. Supp. 2d at 42).  Here, the evidence establishes that Iran promoted the use of suicide

bombers, and provided regular financial support for Hamas' activities—which included such

attacks.  *See supra* Section III.B.  These facts support a finding that defendants provided material support for the suicide bombing—an extrajudicial killing—that led to the death of Alan Beer.

### 2.    Actor

The Court has already determined that defendants Iran and MOIS are responsible for the provision of material support which led to the tragic bombing of Egged bus 14A in June of 2003. Specifically, the evidence establishes that Iran provided funds to MOIS, which it then funneled money to Hamas agents for use in their various terrorist operations.  *See supra* Section III.B. Defendants may be held liable for such acts under the state-sponsored terrorism exception.

### 3.    Theory of Recovery – Causation & Injury

As set forth above, plaintiffs in FSIA cases must set forth a legal theory that courts can apply to the facts of the case in order to determine whether a foreign state may be held liable under the federal cause of action in § 1605A.  Here, plaintiffs have not stated any such theory under Count I, which sets forth their federal claim; however, the Court will borrow the general theories of tort liability that form the bases of plaintiffs' otherwise-improper state law claims. Based on this construction of the Complaint, plaintiffs have articulated theories of wrongful death, survival, and intentional infliction of emotional distress.

*Wrongful Death*

Actions for wrongful death present a particular challenge under the new state-sponsored terrorism exception, which seeks to create uniform standards of liability by distilling general principles of common law theories of liability and infusing them into a comprehensive federal cause of action.  *See In re Terrorism Litig.*, 659 F. Supp. 2d at 59 (noting that federal cause of action "will ensure a greater degree of fairness to FSIA terrorism plaintiffs while furnishing a level of consistency and uniformity").  Specifically, unlike many theories of liability in tort—

such as assault, battery, and intentional infliction of emotional distress—"[a]t common law no civil action was maintainable . . . against a person for the wrongful death of another." *Semler v. Psychiatric Inst. of Wash. D.C.*, 575 F.2d 922, 924 (D.C. Cir. 1978). Thus, rather than wrongful death theories developing through judicial precedent, "the omission of the common law has been corrected in every state by statutes colloquially known as 'wrongful death acts.'" Restatement (Second) of Torts § 925 cmt. a (1979); *see also Heinhold v. Bishop Motor Express, Inc.*, 660 F. Supp. 382, 385 (N.D. Ind. 1987) ("[W]rongful death actions did not exist at common law, but are purely creatures of statute.") (citing *Cunningham v. Werntz*, 303 F.2d 612 (7th Cir. 1962)). As a result of this historical phenomenon, the precise nature and scope of any wrongful death action is generally controlled by the applicable state statute, rather than common law principles. *See* Restatement (Second) of Torts § 925 (noting that certain features of wrongful death actions "depend[] upon the wording of the statute creating the right of action and its interpretation").

In other FSIA suits, however, this Court has begun to articulate some general rules concerning actions for wrongful death under § 1605A. In particular, the *Murphy* Court defined "[a] wrongful-death action [as] one brought by a decedent's heirs at law, [which] may be brought through the estate of the decedent, 'for economic losses which result from a decedent's premature death.'" ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *57 (quoting *Flatow*, 999 F. Supp. at 27). Here, Harry Beer, the deceased's brother, brings the claim of wrongful death on behalf of Alan Beer's estate. Thus, because the Court determined above that the routine provision of financial support flowing from defendants to Hamas ultimately caused, *inter alia*, the 2003 bombing that led to Mr. Beer's death, it finds that a claim for wrongful death has been established by sufficient evidence.

*Survival*

Much like actions for wrongful death, survival actions were severely limited by the common law: "[A]t common law, tort claims do not survive a plaintiff's death." *Henson v. W.H.H. Trice & Co.*, 466 F. Supp. 2d 187, 192 (D.D.C. 2006); *Soroka v. Beloff*, 93 F. Supp. 642, 644 (D.D.C. 1950) (noting that under common law, general rule of survival was that "no right of action for an injury to the person . . . shall survive"); *see also* 1 Am. Jur. 2d *Abatement, Survival and Revival Summary* § 51 (2010) ("At common law . . . nonsurvivable actions are those in which the injury complained of is to the person."). And as with wrongful death actions, every state has passed what is called a 'survival statute,' which generally preserves rights possessed both by and against decedents in response to dissatisfaction with the failure of rights of action possessed to survive the death of a party. *See, e.g.*, *Stone v. Brewster*, 399 F.2d 554, 556 (D.C. Cir. 1968) ("This broad survival statute was enacted for the purpose of abrogating, in part at least, the harsh rule of the common law on the subject of survival."). As a result, general principles concerning survivability have not developed within the structure of the common law, but rather may only be distilled from the variety of state statutes on the legal theory of survival.

Courts and commentators have, however, had an opportunity to discuss some general rules concerning survival actions. As an initial matter, "[t]he trend in the courts is to abrogate common law concepts that formerly restricted survival statutes" in order to provide broad rights of survivability. Alan J. Jacobs, 1 Am. Jur. 2d. *Abatement, Survival, and Revival* § 53; *see also id.* at § 52 ("The rule of the common law on survival . . . has been greatly modified by statute, both by enlarging the number of causes that do survive and by restricting operation of the rule in those causes in which the common law is generally retained."). Another overarching principle, recognized by a district court in one FSIA action, is that survival statutes generally permit plaintiffs to recover for only injuries "suffered during the period between injury and death."

*Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000); *see also Schmerbauch v. Wright*, 1998 U.S. Dist. LEXIS 17810, at *15 (D. Vt. Sep. 9, 1998) (noting "general rule" that recovery under survival statutes may be made only for "conscious pain and suffering"). The Court is also aided by the Model Survival and Death Act, which provides that "a cause of action does not abate by reason of the death of a person . . . [and] may be maintained by . . . the personal representative of a decedent," 1 Am. Jur. 2d *Abatement, Survival, and Revival* § 52, and that "[d]amages recoverable on behalf of a decedent under [the Model Act] . . . are limited to those that accrued to him or her before death." *Id*. On the basis of general principles concerning survivability, as well as the Model Act, the Court holds that plaintiffs acting as representatives of decedents in FSIA actions set forth a proper theory of recovery under § 1605A's federal cause of action where they present sufficient evidence to establish that the decedent suffered conscious pain and suffering between the injury and his death as a result of the defendants' actions.

Applying this standard, here the evidence here establishes that a proper survival claim has been set forth by Harry Beer on behalf of the deceased Alan Beer. According to the testimony of Mr. Beer's nephew Pesach Dov Maisel, a doctor responding to the scene of the 2003 bombing stated that Mr. Beer survived the initial bombing, and lived—in great pain—for a few hours before dying in transit to the hospital. Based on this testimony, the Court finds that Harry Beer, on behalf of the decedent, has established a right to recover for the pain and suffering that Alan Beer experienced as a result of the 2003 bombing.

*Intentional Infliction of Emotional Distress*

FSIA Courts have, on numerous occasions since the enactment of the NDAA, articulated the general nature of the theory of recovery based on intentional infliction of emotional distress, explaining: "One who by extreme and outrageous conduct intentionally or recklessly causes

severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser*, 659 F. Supp. 2d at 26 (citing Restatement (Second) of Torts § 46(1)). The scope of this theory is limited by two qualifications: the plaintiff must be "a member of [the injured person's] immediate family" and must be "present at the time." Restatement (Second) of Torts § 46(2)(a)–(b).

Here, plaintiffs have provided sufficient evidence to support their theories of intentional infliction of emotional distress. As this Court found in *Beer I*, "[d]efendants' conduct, in providing material support in a civil conspiracy with Hamas to conduct suicide bombings, is extreme, outrageous and goes beyond all possible bounds of decency," 574 F. Supp. 2d at 12, and that conduct—which led to the death of Alan Beer—caused plaintiffs to suffer "severe emotional distress." *Id*. As to the two limitations on this theory, plaintiffs are all part of Mr. Beer's immediately family, and the presence requirement is waived in this case due to the unique nature of defendants' conduct. *See Anderson v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, 2010 U.S. Dist. LEXIS 126457, at *45–46 (D.D.C. Dec. 1, 2010) (holding that "[t]errorism is unique . . . in both its extreme methods and aims . . . [and is] intended to cause the highest degree of emotional distress . . . [thus] a plaintiff need not be present") (internal citations and quotations omitted). Plaintiffs therefore may recover for intentional infliction of emotional distress.

### 4. Jurisdiction

The Court has already determined that it may exercise jurisdiction over defendants, and that plaintiffs are only seeking monetary compensation. *See Supra* Section IV.A. Plaintiffs have therefore provided sufficient evidence to support each element of the federal cause of action under § 1605A, and thus the Court holds defendants liable for the death of Alan Beer, which resulted from the tragic suicide bombing of Egged bus 14A in Jerusalem on June 11, 2003.

## V. DAMAGES

### A. Compensatory Damages

In *Beer I* plaintiffs sought—and received—compensatory damages for claims that were functionally identical to those set forth here. *See supra* Section II.A. Those damages included $500,000 to Alan Beer's estate, $5 million to his mother for intentional infliction of emotional distress, and $2.5 million to each of his three siblings for intentional infliction of emotional distress. *Beer I*, 13–14. The Court denied plaintiffs' request for punitive damages, however, holding that such damages were unavailable under former § 1605(a)(7). *Id.* at 14.

Here, plaintiffs have provided sufficient evidence to establish the liability of defendants under the federal cause of action in § 1605A on the basis of theories of wrongful death, survival, and intentional infliction of emotional distress. *See supra* Section IV.D. However, "[t]he law recognizes that, in determining the amount of a damages award . . . there must be no double recovery." *16 Cobalt LLC v. Harrison Career Inst.*, 590 F. Supp. 2d 44, 50 (D.D.C. 2008). Indeed, "it 'goes without saying that the courts can and should preclude double recovery by an individual.'" *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) (quoting *General Tel. Co. v. EEOC*, 446 U.S. 318, 333 (1980)). Thus this Court has previously noted that in a FSIA action brought by a plaintiff under § 1605A—where that plaintiff had previously recovered compensatory damages under former § 1605(a)(7)—he could only seek punitive damages. *See Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *39 ("Properly recognizing that the rule of double-recovery would prevent him from obtaining additional compensatory damages . . . plaintiff here seeks only punitive damages.").

The fact that plaintiffs now assert a federal cause of action under § 1605A in this action—rather than relying upon state law claims—does not change this analysis. "It is well-

settled that a plaintiff is not permitted to recover multiple awards for the same injury." *Kakeh v. United Planning Org., Inc.*, 655 F. Supp. 2d 107 (D.D.C. 2009) (collecting cases). And the fact that plaintiffs assert 'different' causes of action does not change the fact that there is but one injury at issue. *Beer I*, 574 F. Supp. 2d at 13 (denying recovery for infliction of pain and suffering because plaintiffs "are entitled to an award for intentional infliction of emotional distress" and "any additional recovery . . . constitutes an impermissible double recovery"); *see also* Restatement (Second) of Judgments § 24 cmt. c ("That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims."). Based on these principles, plaintiffs who obtained compensatory damages from a suit brought pursuant to former § 1605(a)(7)—including those before the Court in this case—may not obtain additional compensatory relief as a remedy to the federal cause of action in § 1605A where that subsequent suit arises out of the same terrorist act.

### B.    Punitive Damages

The only remaining issue, then, is plaintiffs' request for $300 million in punitive damages.[5] "Punitive damages, only recently made available under the revised FSIA terrorism exception, serve to punish and deter" actors from committing the acts for which they are imposed. *Valore*, 700 F. Supp. 2d at 87 (citing *In re Terrorism Litig.*, 659 F. Supp. 2d at 61). In determining the proper damages amount, the Court evaluates four factors: "(1) the character of the defendants' act, (2) the nature and extent of the harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of defendants." *Id.* (citing *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)).

---

[5] As discussed above, the Court held that punitive damages were unavailable to plaintiffs in their previous suit, which was brought pursuant to former § 1605(a)(7). *See supra* Section II.A.

Historically, in FSIA actions against the Iranian state, courts award a punitive damage amount that is based on Iran's budget for terrorist activities, enhanced by an appropriate multiplier. *See Murphy v. Islamic Republic of Iran*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *75 (noting that, in determination of punitive damages, "[t]wo numbers are at issue . . . the amount of Iran's annual expenditures on terrorist activities[] and the multiplier"). In general, this practice has led to awards of several-hundred million dollars, or more. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 89–90 (award $1 billion in punitive damages ); *Heiser*, 659 F. Supp. 2d at 31 (awarding $300 million in punitive damages).

However, the Court must be mindful that it must not impose "grossly excessive or arbitrary punishments on a tortfeasor." *Hunter v. D.C.*, 384 F. Supp. 2d 257, 261 (D.D.C. 2005) (internal quotations omitted). To evaluate whether a particular punitive damages award is 'grossly excessive or arbitrary,' recent Supreme Court guidance on punitive measures has increasingly focused on the ratio between punitive damages and compensatory damages awarded in a particular case. *See, e.g.*, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 598 (2008) (finding that punitive-to-compensatory damages ratio of 1:1 "is a fair upper limit in such maritime cases"); *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process."). And courts in this district have given increased attention to these ratios as well. *See, e.g.*, *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, No. 10 Civ. 23, 2010 U.S. Dist. LEXIS 104934, at *20–21 (D.D.C. Sep. 30, 2010); *Thomas v. Nat'l Legal Prof'l Assocs.*, 594 F. Supp. 2d 31, 33–34 (D.D.C. 2009).

Focusing on these ratios here, however, raises a particular problem. Specifically, the number of plaintiffs in this action is limited by the fact that this suit arises from the death of a

single American citizen. Given the small number of plaintiffs involved, the Court awarded only $13 million in compensatory damages in *Beer I*.

This limited award raises two distinct, but related, issues. First, the Court expresses concern that an award of several-hundred million dollars in punitive damages would establish a punitive-to-compensatory ratio of $25 or $30 to $1. Such a ratio is well beyond the Supreme Court's tentative upper-bound of a single-digit ratio. *State Farm*, 538 U.S. at 425 (2003); *see also Thomas*, 594 F. Supp. 2d at 34 (noting that "single digit" ratios are more likely to comport with guidance provided by Supreme Court). And while the Court is well aware that acts of terrorism are qualitatively different to more common torts, it is equally aware that a ratio approaching $30 might be considered extreme under current law. This is particularly true given that the *State Farm* Court indicated that ratios approaching this level may be appropriate only where "a particularly egregious act resulting in only a small amount of economic damages," and emphasized that "[w]hen compensatory damages are substantial, then a lesser ratio . . . can reach the outermost limit." 538 U.S. at 425. Here, while $13 million in compensatory damages may be significantly less than awards in other FSIA cases, that disparity is related almost exclusively to the small number of plaintiffs in this action. *See Beer I*, 574 F. Supp. 2d at 13 (noting that awards of $5 million to parents and $2.5 million to siblings—the awards given in that case— were consistent with "a general framework" in terrorist actions).

Second, the Court is also concerned that this ratio is wholly inconsistent with ratios established in other FSIA actions that have come before the Court following the enactment of § 1605A. Specifically, to date this Court has rendered punitive damage judgments under § 1605A involving two different terrorist attacks—the 1983 bombing of the U.S. Marine barracks in Beirut, Lebanon, and the 1996 bombing of Khobar Towers, a U.S. military housing facility in

Dhahran, Saudi Arabia. Prior to the horrific events of September 11th, 2001, the 1983 attack on the U.S. Marine barracks was "the most deadly state-sponsored terrorist attack upon Americans" in history. *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *1. The nature of the attack indicated that Iran and MOIS sought "to inflict maximum devastation and death," *Anderson*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 126457 at *50, and they ultimately killed 241 American servicemen while wounding hundreds of others. *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *1. In particular, the evidence presented in FSIA cases relating to the 1983 bombing established that Iran and MOIS, *inter alia*, ordered the perpetrators of the attack to undertake 'spectacular' action against the U.S. presence in Lebanon, provided the group with specialized explosive materials, and trained the perpetrators in a manner necessary to maximize the devastation caused by those materials. *Anderson*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 126457 at *39–41. Over several cases, the Court has established a ratio of $3.44 applicable to this event. *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *81.

The Khobar Towers bombing, which occurred in 1996, destroyed a residential building that housed U.S. Air Force personnel in Saudi Arabia. *Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *1. The explosion, which at the time was the largest non-nuclear detonation to have ever occurred—eclipsing the force of the Beirut bomb—killed 19 Air Force personnel, and injured scores of others. *Id*. The evidence presented in these cases demonstrates that the perpetrators of the attack—members of Hezbollah, a well-known terrorist organization—had received material support from Iran and MOIS in planning and preparing for the attack. *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 253 (D.D.C. 2006). And in a recent case, this Court explained that "[t]he bombing of the Khobar Towers complex was a deliberate strike at U.S. personnel designed to inflict maximum damage and massive fatalities." *Rimkus*,

___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *55–57. The Court in cases related to this attack has applied a ratio of $1.03. *Id.*

In light of these established ratios, a measure of $25 to $30 might appear to be inappropriate. Indeed, given that the relative involvement of defendants in this attack was less than in either the 1983 barracks bombing or the 1996 attack on Khobar Towers, the proper ratio here may well be less than either of these ratios. Combined with the issue relating to the general excessiveness of the potential ratio in this case, as explored above, these concerns raise serious questions about the proper measure of punitive damages in this case. However, in light of the fact that plaintiffs have not had an opportunity to address these matters, the Court will reserve judgment as to punitive damages at this time, and the parties will be given an opportunity to brief these issues following the issuance of this opinion.

## VI. CONCLUSION

Suicide bombings are a horrific, and all too common, method of terror employed by Hamas and other terrorist organizations. The Court shares in plaintiffs' grief over this tragic loss of Alan Beer, and admires their bravery in taking steps in trying to prevent further malicious attacks from occurring in the future. While the Court is all too aware that any punitive damages levied in this case will bring little comfort to Mr. Beer's family, it takes solace in the hope that such measures may help prevent another family from suffering such a terrible loss, and it awaits plaintiffs' view as to the appropriate punitive measures here.

Signed by Royce C. Lamberth, Chief Judge, on December 9, 2010.