**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HARRY BEER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 08-cv-1807 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION AND BACKGROUND

This action arises out of the June 11, 2003 suicide bombing of a bus in Jerusalem, Israel

by members of the terrorist organization Hamas.[1]  The attack killed 17 individuals, including

Alan Beer, a United States citizen living in Israel at the time.  Plaintiffs, who include Mr. Beer's

estate, his mother and his siblings, brought suit under the state-sponsored terrorism exception to

the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, alleging that defendants

Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS")

provided financial and material support to Hamas, and are thus liable for the death of Mr. Beer.

They seek $150 million in compensatory damages and $300 million in punitive damages.

Complaint 8, Oct. 17, 2008 [3].  The Court has already determined that defendants are "liable for

the death of Alan Beer, which resulted from the tragic suicide bombing of Egged bus 14A in

Jerusalem on June 11, 2003."  *Beer v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 08

Civ. 1807, 2010 U.S. Dist. LEXIS 129953, at * 43 (D.D.C. Dec. 9, 2010) ("*Beer II*").

---

[1] References to "Hamas" are to "Harakat al-Muqawama al-Islamiyya, the jihadist Palestinian militia" generally known by that name.  *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 79 (D.D.C. 2006).

This is not the first action brought by plaintiffs against these defendants. In *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1 (D.D.C. 2008) ("*Beer I*"), these same plaintiffs successfully pursued claims against Iran and MOIS under the former state-sponsored terrorism exception, which was codified at 28 U.S.C. § 1605(a)(7). In that case, this Court held that defendants were liable under state-law theories of wrongful death, infliction of conscious pain and suffering, and intentional infliction of emotional distress. *Beer I*, 574 F. Supp. 2d at 11–12. The *Beer I* Court awarded plaintiffs compensatory damages totaling $13 million, *id*. at 13–14, and denied plaintiffs' request for a punitive award. *Id*. at 14.[2]

Because plaintiffs previously received compensatory damages, this Court has already rejected plaintiffs' request for such an award in this case, holding that

> [p]laintiffs who obtained compensatory damages from a suit brought pursuant to former § 1605(a)(7)—including those before the Court in this case—may not obtain additional compensatory relief as a remedy to the federal cause of action in § 1605A where that subsequent suit arises out of the same terrorist act.

*Beer II*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 129953 at *43–46. However, punitive damages are available under the current state-sponsored terrorism exception, 28 U.S.C. § 1605A(c), and thus plaintiffs may recover such damages here.[3] Though a procedure for the calculation of punitive damages is well-established in FSIA jurisprudence, the Court in *Beer II* expressed, for the first time, concern as to whether this traditional method remains appropriate in light of recent Supreme Court decisions calling for increased restraint and heightened review of punitive damages. ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 129953 at *46–53. After articulating these concerns, the *Beer II* Court announced that it would "await[] plaintiffs' view as

---

[2] Under the prior state-sponsored terrorism exception, "punitive damages were not available against foreign states." *Beer I*, 574 F. Supp. 2d at 14.

[3] Principles of finality would normally bar a second suit against defendants for the same events. However, when Congress passed the current state-sponsored terrorism exception it also created a provision that permits plaintiffs with existing suits to bring subsequent actions under the new exception. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 65 (D.D.C. 2009).

to the appropriate punitive measures" in this case. *Id.* In response, plaintiffs submitted a brief in which they argue that "the amount of punitive damages requested . . . passes Constitutional muster," because defendants' conduct was "without a doubt highly reprehensible." Memorandum Regarding Punitive Damages 4, Jan. 10, 2011 [28] ("Ps.' Br."). Plaintiffs also emphasize that their request "is based on a specific methodology formulated by an expert . . . and adopted by this Court" that is "carefully designed to deter Iran from future misconduct." *Id.* at 5. For the reasons set forth below, the Court holds that the long-standing method for calculating punitive damages in terrorism-related suits under the FSIA should continue to govern suits under § 1605A, and awards punitive damages as appropriate under that framework.

## II.    LEGAL STANDARD

### A.    The Standard Method for Calculating Punitive Damages in FSIA Cases

When Congress passed the FSIA, it was clear that the state-sponsored terrorism exception rendered foreign states subject to suit in the United States for acts of terrorism. However, the original Act left several questions, including what sorts of damages were available to plaintiffs, unanswered. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 43 (D.D.C. 2009) ("*In re Terrorism Litig.*"). In an effort to resolve these issues, Congress enacted Pub. L. 104-208, § 589, 110, 110 Stat. 3009-1, 3007-172 (1996) (codified at § 1605 note), which is commonly known as the "Flatow Amendment." This provision, among other things, specified that "money damages [in FSIA suits] may include economic damages, solatium, pain, and suffering, and *punitive damages*," *id.* (emphasis added), and thus provided the basis for the earliest judgments awarding punitive damages under the FSIA.

In *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998), this Court issued the first opinion finding Iran liable under the state-sponsored terrorism exception. *In re Terrorism*

*Litig.*, 659 F. Supp. 2d at 44. That opinion included a substantial discussion on the best method for calculating punitive damages in state-sponsored terrorism cases. *See generally Flatow*, 999 F. Supp. at 32–34. Relying on "traditional principles of tort law and analogous opinions under the Alien Tort Claims Act . . . and the Torture Victim Protection Act . . . for guidance," *id*. at 32, this Court identified four factors relevant to the assessment of punitive damages: "(1) the nature of the [defendant's] act . . .; (2) the circumstances of its planning; (3) defendants' economic status with regard to the ability of defendants to pay; and (4) the basis upon which a court might determine the amount of an award reasonably sufficient to deter like conduct in the future." *Id*. at 33. The Court also received testimony from Dr. Patrick Clawson, a well-known expert on international terrorism and Iranian affairs,[4] who explained that Iran's annual expenditures on international terrorism were approximately $75 million and opined that "a factor of three times [Iran's] annual expenditure for terrorist activities would be the minimum amount which would affect the conduct of . . . Iran." *Id*. at 34. Drawing from the four-factor test and Dr. Clawson's expert testimony, the *Flatow* Court adopted a process for calculating punitive damages in which a FSIA court multiplies a defendant's financial support for international terrorism (then $75 million) by a pre-determined multiplier (generally between 3 and 5) (the "*Flatow* Method"). *Id*. This Court explained that the resulting award—$225 million in *Flatow*—best serves the societal interests in punishment and deterrence that warrant imposition of punitive sanctions. *Id*.

While a number of FSIA courts subsequently assessed punitive damages using the *Flatow* Method, such awards were brought to a screeching halt by the D.C. Circuit in *Cicippio-Puleo v. Islamic Republic of Iran*, in which it held that "neither section 1605(a)(7) nor the Flatow Amendment, separately or together, establishes a cause of action against foreign state sponsors

---

[4] *See Beer II*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 129953 at *4 (collecting cases in which Dr. Clawson is described as "an expert on Iranian affairs and international terrorism").

of terrorism." 353 F.3d 1024, 1027 (D.C. Cir. 2004). The *Cicippio-Puleo* decision thus reduced the prior state-sponsored terrorism exception to a jurisdictional "pass-through" and forced future plaintiffs to look to other sources of law—primarily state tort law—to identify legal bases for their suits. *See, e.g.*, *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 197–98 (D.D.C. 2008) (awarding damages for intentional infliction of emotional distress under Missouri law) ("*Rimkus I*"); *Beer I*, 574 F. Supp. 2d at 11–14 (awarding damages for wrongful death and conscious pain and suffering under Ohio law); *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 69–75 (D.D.C. 2006) (awarding damages for assault and battery under D.C. law). "Another consequence of the *Cicippio-Puleo* decision was that the Flatow Amendment could not serve as an independent basis for punitive damage awards" against foreign states. *In re Terrorism Litig.*, 659 F. Supp. 2d at 48. Thus, while courts continued to award substantial compensatory relief to plaintiffs, they had to repeatedly deny those plaintiffs' requests for punitive damages. *See, e.g.*, *Rimkus I*, 575 F. Supp. 2d at 198 ("As a general rule, punitive damages are not available against foreign states."); *Beer I*, 574 F. Supp. 2d at 14 (holding punitive damages unavailable under § 1605(a)(7)); *Haim*, 425 F. Supp. 2d at 71 (same).

In early 2008, Congress moved to reverse this trend through amendments to the FSIA enacted as part of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3. 338–44 (2008) ("NDAA"). These Amendments struck § 1605(a)(7) and replaced it with the current state-sponsored terrorism exception, which is codified at 28 U.S.C. § 1605A. Among numerous changes to the law, § 1605A now "provides for the recovery of punitive damages in suits based on acts of terrorism." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 167 (D.D.C. 2010) (citing 28 U.S.C. § 1605A(c)). Over the past three years, FSIA courts have resumed awarding punitive damages pursuant to this statute—a trend aided by

the NDAA's provision for retroactive application of § 1605A.  *See* NDAA § 1083(c)(2)–(3) (permitting retroactive application of § 1605A to cases concluded under prior exception).

In awarding damages following passage of the NDAA, courts have generally identified the *Flatow* Method as the procedure that best serves the retribution and deterrence interests that Congress sought to promote in enacting the 2008 Amendments.  *See In re Terrorism Litig.*, 659 F. Supp. 2d at 61 (holding that, post-NDAA, courts "reaffirm[] the principles first articulated in *Flatow* with respect to awards of punitive damages" under FSIA).  Just as it was prior to *Cicippio-Puleo*, current judicial assessments of punitive damages in state-sponsored terrorism cases involve two figures:  the amount that a foreign state annually provides in support of terrorist activities, known as the multiplicand, and the multiplier that FSIA courts deem necessary to deter future conduct.  As seen in one recent case:  "[T]he Court chooses to take the mean of the range's two extremes ($50 million and $150 million) and multiply it ($100 million) by three.  The result, as an award of $300 million, appears fitting."  *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 30 (D.D.C. 2009) ("*Heiser II*"); *see also, e.g.*, *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 58–59 (D.D.C. 2009) (multiplying $100 million times 3 to award $300 million in punitive damages).  Thus, today the *Flatow* Method is "well settled case law on the methodology by which punitive-damage awards in FSIA cases are calculated." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 90 (D.D.C. 2010).

## B.    Recent Supreme Court Jurisprudence on Punitive Damages

Outside the limited arena covered by federal statutes, development of the law of punitive damages has historically been left to the States, whose legislatures and courts have passed laws and developed principles concerning such sanctions.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1998) ("States necessarily have considerable flexibility in determining the level of

punitive damages that they will allow in different classes of cases and in any particular case.")

("*Gore*").  Recently, however, the Supreme Court has begun to scrutinize punitive awards with

increasing intensity, and has articulated several principles derived from both the Due Process

Clause—which forbids awards that are "grossly excessive," *id*.—and general notions of fairness.

As the *Gore* Court explained:  "Elementary notions of fairness . . . dictate that a person receive

fair notice not only of the conduct that will subject him to punishment, but also the severity of

the penalty that" may be imposed.  *Id*. at 574.  The Supreme Court has identified three

"guideposts" for analyzing whether these basic requirements are met: (1) "the degree of

reprehensibility of the" defendant's act; (2) "the disparity between the harm or potential harm

suffered . . . and [the] punitive award;" and (3) the difference between the punitive award and

"the civil penalties authorized or imposed in comparable cases."  *Id*. at 574–75.

The concerns expressed in *Gore* are not merely problems of a constitutional dimension,

however, as the Supreme Court recently made clear in *Exxon Shipping Co. v. Baker*, 554 U.S.

471 (2008).  That case presented the Court with a challenge to a punitive award that "differ[ed]

from due process review because the case ar[ose] under federal maritime jurisdiction."  *Id*. at

501.  As the *Exxon* Court explained, the objections to the purportedly excessive punitive damage

awards in that case "go[] to our understanding of the place of punishment in modern civil law

and reasonable standards of process in administering punitive law."  *Id*. at 490.  In response, the

Supreme Court imported into the field of maritime law many of the principles concerning

punitive damages that it originally developed as matters of Due Process.  *See generally id*. at

508–13.  Together with its Due Process formulations, the Supreme Court's recent jurisprudence

has produced a method for evaluating punitive damage awards in which reviewing courts

examine the ratio between punitive damages and compensatory damages to determine whether

the sanctions are improperly excessive or arbitrary. *Beer II*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 129953 at *47–48.

C.      The *Flatow* Method in Light of Recent Jurisprudence

As the foregoing discussion highlights, an examination of the continuing viability of the established process for calculating punitive damages first set forth in *Flatow* requires the Court to confront two issues: whether the bases for the Supreme Court's decisions are applicable in FSIA suits and, if so, whether the *Flatow* Method complies with the constraints implemented by this recent jurisprudence. This first issue in turn raises two distinct questions. First, do the limitations on punitive damage awards articulated by the Supreme Court under the Due Process Clause of the Fourteenth Amendment apply with equal force in this context? Second, does the extension of these constraints to general maritime law by the *Exxon* Court necessitate further extension of these same principles to FSIA suits? For the reasons set forth below, the Court answers both questions in the negative and holds that recent Supreme Court decisions play no role in terrorism-related FSIA suits. The Court thus concludes that the *Flatow* Method remains controlling in actions brought pursuant to the state-sponsored terrorism exception.[5]

1.      **Defendants in FSIA State-Sponsored Terrorism Cases May Not Rely Upon Principles of Due Process to Shield Themselves from Punitive Damage Awards**

With the exception of *Exxon*, which is discussed *infra*, the Supreme Court's recent jurisprudence concerning punitive damages finds its genesis in individual liberty interests inherent to notions of Due Process embodied in the Constitution. In *Gore*—the case in which the Supreme Court first elevated the review of state court punitive damage awards to a constitutional dimension—the opinion begins with one fundamental tenet: "The Due Process Clause of the

---

[5] Because the Court concludes that the Supreme Court's punitive damage jurisprudence has no effect on the procedures employed by the FSIA courts, it does not reach the issue of whether the *Flatow* Method itself would comply with the principles articulated in those recent decisions.

Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." 517 U.S. at 562. From this central principle, the Court derives its three guideposts for the review of punitive damage awards. *Id*. at 574–86. In this same vein, several punitive damage principles the Supreme Court has subsequently articulated—including its concerns with excessive or arbitrary awards, *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."), its focus on the importance of damage ratios to the proper evaluation of punitive damage awards, *see id*. at 425 ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."), and its concern with the adjudication of harm to non-parties through the imposition of excessive penalties in a single case, *see Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) ("[T]he Constitution's Due Process Clause forbids a State to use a punitive damage award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation.")—are all explicitly drawn from the Due Process Clause.

These constitutional concerns, however, are inapplicable here. As an initial matter, FSIA litigation arises under a federal statute and does not involve the exercise of State authority against the defendant; as a result, the Fourteenth Amendment—upon which the Supreme Court's recent line of decisions all rely—is not implicated here. *See SEC v. Lines Overseas Mgmt., Ltd.*, No. 04 Misc. 302, 2007 U.S. Dist. LEXIS 11753, at *8 (D.D.C. Feb. 21, 2007) ("'It is well established that when, as here, a federal statute provides the basis for jurisdiction, the constitutional limits of due process derive from the Fifth, rather than the Fourteenth, Amendment.'") (quoting *Rep. of Panama v. BCCI Holdings*, 119 F.3d 935, 942 (11th Cir.

1997)).  This is not the end of the matter, however, as suits—such as this one—brought pursuant to the federal statute remain subject to the Fifth Amendment's Due Process Clause, *id*., and it is generally accepted that the same prohibitions against grossly excessive punitive damage awards articulated by the Supreme Court under the Fourteenth Amendment operate with equal force under the Fifth.  *See, e.g.*, *Kunz v. DeFelice*, 538 F.3d 667, 678–79 (7th Cir. 2008) (applying *Gore* guideposts to punitive damage award under § 1983).

Though the Fifth Amendment supplies equal limitations on punitive damages in cases brought under federal statutes, defendants here, as foreign sovereigns, cannot use these constitutional constraints to shield themselves.  In *Price v. Socialist People's Libyan Arab Jamahiriya*, the D.C. Circuit squarely held that "foreign states are not 'persons' protected by the Fifth Amendment," and thus cannot assert protections afforded to U.S. citizens by the Due Process Clause.  294 F.3d 82, 96 (D.C. Cir. 2002).  In that opinion, the Circuit Court articulated several justifications in support of this conclusion.  First, as a simple matter as statutory interpretation, the *Price* Court observed that "in common usage, the term 'person' does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it." *Id*.  Second, the D.C. Circuit stressed the incongruence that would arise if courts were to extend basic Due Process protections to foreign sovereigns when the States of the Union themselves are forbidden from asserting such rights under the Fifth Amendment.  *Id*.  It also reasoned that because the Constitution explicitly places limits upon the power that the States can exert against the federal government, were it to extend Due Process protections to foreign states it would be granting powers to sovereign entities that go beyond those possessed by the States.  *Id*. at 97. Finally, the D.C. Circuit explained that "[r]elations between nations in the international community are seldom governed by the domestic law of one state or the other," noting that

"legal disputes between the United States and foreign governments are not mediated through the Constitution." *Id.* For all these reasons, the Circuit Court concluded that foreign state defendants in terrorism-related suits under the FSIA may not raise objections grounded in the Due Process Clause of the Fifth Amendment.

Though *Price* addressed foreign states and not other foreign entities, *see* 294 F.3d at 99–100 ("We express no view as to whether other entities that fall within the FSIA's definition of 'foreign state' . . . could yet be considered persons under the Due Process Clause."), the D.C. Circuit returned to the issue in *TMR Energy Ltd. v. St. Prop. Fund of Ukraine*, in which it held that where a foreign state "exert[s] sufficient control over [an entity] to make it an agent of the State, then there is no reason to extend to [that entity] a constitutional right that is denied to the sovereign itself." 411 F.3d 296, 301 (D.C. Cir. 2005); *see GSS Grp., Ltd. v. Nat'l Port Auth.*, No. 09 Civ. 1322, 2011 U.S. Dist. LEXIS 33617, at *9 (D.D.C. Mar. 30, 2011) ("[A] foreign instrumentality . . . may nevertheless be so closely associated with the foreign sovereign that the two are legally indistinguishable, with the result that the instrumentality, as part of the foreign government, is not a 'person' entitled to due process protections"). To determine if an entity is sufficiently intertwined so as to be considered the sovereign, the *TMR Energy* Court drew a distinction between entities that perform "classic government functions" and those that operate "in the field of commerce," explaining that only the former are considered the foreign state for constitutional purposes. 411 F.3d at 300–02. Courts subsequently applying this test have consistently found that MOIS constitutes the foreign state and is thus unworthy of Due Process protections. *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 68 (D.D.C. 2010) (holding that "[i]t is clear . . . that Iran has plenary control of MOIS" and thus MOIS is "not a person entitled to Fifth Amendment" protections); *see also Valore*, 700 F. Supp. 2d at 71 (same).

The opinions in *Price*, *TMR Energy* and their progeny focus on questions of Due Process inherent to a court's assertion of jurisdiction; however, the rationales for denying constitutional safeguards to foreign entities set forth in those decisions are equally applicable to any Due Process problems raised by the imposition of punitive damage awards.  Whether the issue is the assertion of jurisdiction or potentially-excessive punitive damages, the key concern implicated is the right to personal liberty enshrined in the Due Process Clause.  *See Gore*, 517 U.S. at 587 (explaining that constitutional problems posed by excessive punitive damage awards "arise[] out of the basic unfairness of depriving citizens of life, liberty, or property, through the application . . . of arbitrary coercion"); *Price*, 294 F.3d at 95 ("[T]he liberty interest protected by the Due Process Clause shields the defendant from the burden of litigating in [a distant] forum.").  And in weighing this liberty interest in *Price*, the D.C. Circuit concluded that "foreign nations are external to the constitutional compact" and thus incapable of asserting that interest, which is reserved for citizens of the United States.  *Id*. at 97.  The D.C. Circuit's holding thus leads the Court to the same conclusion as the Circuit Court with respect to personal jurisdiction—any constraints on punitive damages that may be found in the Fifth Amendment cannot be relied upon by a foreign sovereign.  As in *Price*, foreign states need not be granted *constitutional* protections to shield them from the imposition of harsh or unsound financial sanctions—"[i]f they believe that they have suffered harm by virtue of [imposition of such an award], foreign states have available to them a panoply of mechanisms in the international arena through which to seek vindication or redress."  *Id*. at 98.  The Court will not cross the constitutional Rubicon to extend Due Process protections against punitive damage awards to foreign states here, as such an act would undermine both international and domestic law by extending citizen's safeguards to foreign powers in the face of a clear determination by the Legislative and Executive branches

that foreign sovereigns and their instrumentalities—where engaged in terrorism—*should* be subject to such punitive sanctions. *See id*. at 98–99 ("Conferring on [the foreign state] the due process trump that it seeks against the authority of the United States is thus not only textually and structurally unsound, but it would distort the very notion of 'liberty' that underlies the Due Process Clause."). Quite simply, "a foreign State lies outside the structure of the Union," *id*. at 96, and the Court sees no justification for extending the protections for "persons" provided by that structure to foreign powers such as Iran and MOIS.

### 2. *Exxon* Does Not Require Alteration of the *Flatow* Method

The second question relevant to this inquiry is whether the Supreme Court's extension of its articulated framework for evaluating punitive damages from Due Process to general maritime law requires FSIA courts to reevaluate the established *Flatow* Method in cases brought under the state-sponsored terrorism exception. Based on the discussion below, the Court holds, for three reasons, that the *Exxon* decision does not undermine the traditional procedure.

### a. The Holding in *Exxon* is Limited

While the Supreme Court in *Exxon* first ventured out of the constitutional realm in reviewing punitive damage assessments, it did so in limited fashion and over an area of law which has been specially committed to the discretion of the judiciary. The legal landscape in which the *Exxon* Court operated—maritime law—"falls within a federal court's jurisdiction to decide in the manner of a common law court, subject to the authority of Congress to legislate otherwise if it disagrees." *Exxon*, 554 U.S. at 490. The federal judiciary's special role as the overseers of maritime law is deeply rooted and traces its origins to the beginning of our constitutional republic: "Article III, § 2, cl. 1 (3d provision) of the Constitution and section 9 of the Act of September 24, 1789, have from the beginning been the sources of jurisdiction in

litigation based upon federal maritime law." *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 360 (1959). Historically, the federal courts have been called upon to fashion rules of law *sui generis* to govern admiralty disputes, *see Fitzgerald v. U.S Lines Co.*, 374 U.S. 16, 20–21 (1963) ("This Court has long recognized its power and responsibility in this area [of admiralty law] and has exercised that power where necessary to do so."), and thus maritime has been an area of law in which the judiciary has operated almost exclusively. *Romero*, 358 U.S. at 369. In this unique legal context, the Supreme Court in *Exxon* was left without any legislative or executive guidance through statute or regulation, and thus was obligated to fashion governing principles without consideration of other legal contexts. *See id*. at 502 ("[W]e are examining the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application [of other sources of law.]").

Rules articulated in the context of maritime law are not necessarily applicable to non-admiralty proceedings. The Supreme Court has observed that the implications of changes or evolution in maritime law are generally limited to Article III and do not require equivalent adjustments to the federal common law. *Romero*, 358 U.S. at 373. And this inherent limitation to admiralty-law decisions is of even greater importance when interpreting and applying federal statutes—in the face of legislation enacted by Congress, the federal judiciary is simply not imbued with the same authority it possesses in its unique role as the purveyor of maritime law. *See Exxon*, 554 U.S. at 502 (emphasizing courts' special authority "as a source of judge-made law in the absence of statute"). Indeed, the *Exxon* Court itself acknowledged the crucial distinction between its specialized function in the creation of rules governing admiralty disputes and its traditional role in applying many federal statutes. *See id*. at 511 ("Federal treble-damages statutes govern areas far afield from maritime concerns . . . ; the relevance of the governing rules

in patent or trademark cases, say, is doubtful at best.").  And at least one federal court, relying on this distinction, has declined to extend the holding of *Exxon* to cases brought under the federal Title VII statute.  *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 447 (7th Cir. 2010).  Thus, mindful of the special context in which *Exxon* was articulated, the Court is not prepared to affect a sea-change in the law governing the assessment of punitive damages under federal statutes or federal common law generally.  *See Valore*, 700 F. Supp. 2d at 90 n.17 (noting that Supreme Court in *Exxon* "explicitly limited its holding" to facts and context of that case).

### b.  Congress Re-Affirmed the Established Procedure

An independent justification for adhering to the *Flatow* Method is that Congress did not see fit to alter or otherwise question that procedure when enacting the NDAA.  At the time the 2008 Amendments were passed, the Supreme Court had issued its highly-publicized opinions in *Gore*, *State Farm*, and *Philip Morris*, and was hearing arguments in *Exxon* to much fanfare.  At the same time, the method for calculating punitive damages under the state-sponsored terrorism exception had been long-settled.  Shortly after the decision in *Flatow*, numerous courts in this district came to rely upon the procedure established in that case.  In *Anderson v. Islamic Republic of Iran*, for example, Judge Jackson, after observing that "[i]t is never a simple task to calibrate an award of punitive damages," turned to the *Flatow* Method and the testimony of Dr. Clawson to conclude that "an award of thrice the . . . maximum annual budget for terrorist activities, or $300 million, is the closest approximation that [the Court] can make to an appropriate award." 90 F. Supp. 2d 107, 114 (D.D.C. 2000).  In a similar manner, the district court in *Eisenfeld v. Islamic Republic of Iran* relied explicitly on *Flatow* to determine that "a total award of punitive damages equal to three times Iran's annual expenditure in 1996 on terrorism—$300 million— will serve to deter future attacks."  172 F. Supp. 2d 1, 9 (D.D.C. 2000).  Indeed, a litany of cases

throughout this period applied the *Flatow* Method. *See Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 13 (D.D.C. 2001) (awarding $120 million); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 25–26 (D.D.C. 2002) (awarding $150 million); *Hill v. Republic of Iraq*, 175 F. Supp. 2d 36, 48 (D.D.C. 2001) (awarding $300 million); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128 (D.D.C. 2001) (awarding $300 million); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 39–40 (D.D.C. 2001) (awarding $300 million); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 53 (D.D.C. 2001) (awarding $300 million); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 114 (D.D.C. 2000) (awarding $300 million).

"Courts 'generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.'" *Ark. Dairy Coop. Ass'n v. Dep't of Agriculture*, 573 F.3d 815, 829 (D.C. Cir. 2009) (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988)).  For example, in *Partolo v. Johanns*, the district court held that Congress, in reenacting a law creating an aid program for farmers with lost crops using language identical to that in the original statute, implicitly adopted the manner in which the program had been run by the managing agency.  No. 04 Civ. 1462, 2010 U.S. Dist. LEXIS 43071, at *103–04 (D.D.C. June 11, 2006); *see also id*. ("[W]hen Congress enacted the 2001/2002 CLDAP, explicitly in identical form to the 2000 CLDAP statute and without any indication of disapproval of the Secretary's earlier law . . . it effectively endorsed the Secretary's existing administration and interpretation.").  In reaching this conclusion, the *Partolo* Court noted that "it is well established that Congress is presumed to have knowledge of judicial and administrative interpretations when it re-enacts the earlier laws without change." *Id*. at *102–03 (citing *Barhart v. Walton*, 535 U.S. 212, 220 (2002)).

Here, the decisions of this Court and many others adopting the *Flatow* Method were based on the Flatow Amendment, which provided that money damages in state-sponsored

terrorism suits could "include economic damages, solatium, pain and suffering, and punitive damages." Flatow Amendment § 589. Had Congress been concerned that this established procedure was in conflict with the Supreme Court's recently-articulated constraints on punitive damage awards, it could easily have easily imposed statutory protections against excessive awards in § 1605A by, *inter alia*, directing punitive sanctions to take the form of treble damages—as it often has—or instructing that any punitive damage award must be consistent with the guideposts articulated by the Supreme Court in *Gore* and its progeny. Instead, Congress chose to once again permit an award of punitive damages in state-sponsored terrorism suits by employing *the very same language* that it had used in the Flatow Amendment. *See* 28 U.S.C. § 1605A ("[D]amages may include economic damages, solatium, pain and suffering, and punitive damages."). This choice of language in § 1605A is a clear indication that Congress sought to return FSIA proceedings—at least with respect to punitive damages—to the period prior to the *Cicippio-Puleo* decision, when courts generally adhered to the *Flatow* Method.

Indeed, the presumption that Congress acted with knowledge of the *Flatow* framework is even stronger here, as there is no question that, in passing the NDAA, it was made aware of the history of punitive damages in terrorism-related FSIA cases. This Court has previously observed that when considering the 2008 Amendments, members of Congress were provided with a Congressional Research Service report informing them that, to date, judgments totaling nearly $10 billion had accumulated against Iran and its instrumentalities for involvement in terrorist atrocities. *In re Terrorism Litig.*, 659 F. Supp. 2d 31, 58 (D.D.C. 2009). And armed with this information, one of the explicit purposes in passing the NDAA was to abrogate the D.C. Circuit's decision in *Cicippio-Puleo* and reinstitute FSIA plaintiffs' ability to seek punitive damages in actions against foreign states brought pursuant to the state-sponsored terrorism

exception.  *See Heiser II*, 659 F. Supp. 2d at 23 (observing that "§ 1605A abrogates *Cicippio-Puleo* . . . and provides that punitive damages may be awarded in [FSIA] actions").  This goal included the replacement of the regime relying on 50 states' laws to govern FSIA actions with a uniform set of rules—such as those concerning punitive damages developed in *Flatow*—under § 1605A.  *Id*. at 24–25.  Based on this history, the Court holds that Congress, by drawing directly upon the language of the Flatow Amendment while well-aware of the established *Flatow* Method, implicitly approved the reinstitution of that traditional procedure after concluding that it best serves societal interests in punishment and deterrence.

### c. Terrorism-Related FSIA Cases Involve Unique Circumstances

Finally, beyond the distinguishable legal contexts in which recent Supreme Court jurisprudence arises and the legislative history of the NDAA, there are important policy justifications for adhering to the *Flatow* Method.  Terrorism, along with atrocities such as genocide, occupies a unique place in the pantheon of human conduct as an activity devoid of value that observes no respect for life and no hint of compassion.  It is an "insidious and murderous evil," *In re Terrorism Litig.*, 659 F. Supp. 2d at 136, that embraces "cruel and inhuman activities," *Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 425 (D.D.C. 2007), and results in harms "among the most heinous the Court can fathom."  *Valore*, 700 F. Supp. 2d at 88.  In the context of punitive damages, this Court has previously explained that the particularly malicious and evil nature of state-sponsored terrorism obviates the need for strict attention to the punitive-to-compensatory ratio that recent Supreme Court guidance might otherwise require.  *See id*. at 90 n.17 ("Those harboring a deep-seeded and malicious hatred of the United States who intentionally commit terroristic murder of American[s] . . . deserve to be punished at . . . ratio[s] significantly higher [than discussed in *Exxon* and the like].").  And this Court has expressed

concern that significant deviations from the *Flatow* Method in these cases could have the disastrous and perverse consequence of undermining prior efforts at deterrence. *See Heiser II*, 659 F. Supp. 2d at 30–31 ("Were the Court to award an amount [of punitive damages] less than any of those declared in prior cases, the U.S. . . . would risk seeming to Iran less concerned about Iranian terrorism.") (quotations omitted).

By contrast, the Supreme Court in *Exxon* addressed excessive punitive sanctions out of concern that such awards "exceed[] the bounds justified by the punitive damages goal of deterring reckless (or worse) behavior." 554 U.S. at 490. And in importing Due Process principles into maritime law, the *Exxon* Court emphasized that "[r]eckless conduct is not intentional or malicious, nor is it necessarily callous toward the risk of harming others, as opposed to unheedful of it." *Id*. at 493. In light of this context, the Court finds it beyond the pale that the Supreme Court would countenance similar restrictions on the institution of punitive sanctions in response to acts of terrorism that impose a sentence of death or horrific physical and psychological injury on victims, a lifetime of unimaginable grief on loved ones, and immeasurable sorrow on the whole of humanity.

*          *          *

For all the reasons set forth above, the Court holds that the *Flatow* Method for the calculation of punitive damage awards in FSIA cases should continue to govern cases arising from the atrocities of state-sponsored terrorism.

## III.    APPLICATION

Having determined that the *Flatow* Method remains in force under § 1605A, the Court now turns to the application of this established procedure to calculate punitive damages in this case. As set forth above, *see supra* Section II.A, this process requires the Court to identify two

numbers: the annual amount of money provided by defendants in support of international terrorism, and an appropriate multiplier. As to the former input, plaintiffs make no attempt to provide any new evidence concerning defendants' support for terrorism, and instead point the Court to the "typically adopted . . . figure[] of $100 million in annual expenditures" found in earlier cases. Ps.' Br. at 3. Given the lack of new evidence, the Court will take judicial notice of Dr. Clawson's expert testimony in *Heiser II* that Iran's support for terrorism is somewhere between $50 and $150 million annually, and will adopt the mid-range estimate—$100 million. As to the appropriate multiplier, plaintiffs urge the Court to adhere to its standard choice of 3, *id.*, and the Court sees no reason to abandon this traditional magnitude. Thus, in the interest of deterring future terrorist attacks, and consistent with established procedures, the Court will award $300 million in punitive damages, to be dispersed in proportion to each plaintiff's share of the compensatory award.

## IV.     CONCLUSION

Punitive damages serve a societal interest in punishing wrongdoers and preventing similar heinous conduct in the future. In recent cases, however, the Supreme Court has recognized that these justifications are often countered—and thus constrained—by other interests, such as an individual's right to expect consistent and non-excessive punishments (embodied by the Supreme Court's Due Process jurisprudence), or the Court's responsibility to fill the gaps in an area of law in which it is the sole authority (embodied by the *Exxon* decision in the field of maritime law.) These interests, however, are not implicated in the FSIA context, and courts therefore should continue to adhere to methods designed to impose optimal sanctions when faced with actors deliberately undertaking some of the most evil and inhuman acts imaginable. The Court thus holds that its established approach to assessing punitive awards in

state-sponsored terrorism cases under the FSIA should remain in place, and expresses hope that the sanction it issues today will play a measurable role in changing the conduct of Iran—and other supporters of international terrorism—in the future.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on May 19, 2011.